**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 15 |
| Ambipar Emergency Response, *et al.*[1] | No. 26-90709 |
| Debtors in a Foreign Proceeding | (Joint Administration Requested) |

**MOTION FOR (I) RECOGNITION OF FOREIGN
MAIN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE
AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

> **If you object to the relief requested, you must respond in writing. Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

---

[1] The debtors in these chapter 15 cases (the "Chapter 15 Cases"), along with the last four digits of each Debtor's tax identification or corporate registry number, are: Ambipar Emergency Response (0263), Ambipar Lux S.à.r.l. (9448), Ambipar Participações e Empreendimentos S.A. (01-24), Environmental ESG Participações S.A. (01-23), and Emergência Participações S.A. (01-49). The location of the Debtors' corporate headquarters is Avenida Pacaembu, 1088, São Paulo, São Paulo, Brazil, 01234-0000.

4936-6919-6471

## TABLE OF CONTENTS

PAGE

RELIEF REQUESTED ................................................................................................................ 1

JURISDICTION .......................................................................................................................... 2

PRELIMINARY STATEMENT ................................................................................................. 2

BACKGROUND ......................................................................................................................... 4

    A.    General Background and History .................................................................... 4

        1.    Overview ........................................................................................... 4

        2.    The Ambipar Group's Corporate Structure and Offices ............................. 7

    B.    The Debtors' Assets and Capital Structure ................................................... 9

        1.    The Debtors' Assets and Operations ............................................. 9

        2.    The Debtors' Capital Structure ..................................................... 12

    C.    Events Leading to the Chapter 15 Filing .................................................... 13

    D.    The RJ Proceeding and the Chapter 11 Case ............................................. 15

        1.    The RJ Proceeding ........................................................................ 15

        2.    The Chapter 11 Case ..................................................................... 17

BASIS FOR RELIEF REQUESTED .......................................................................................... 19

    A.    The Debtors Are Eligible for Chapter 15 Relief ........................................ 21

        1.    The Debtors Meet Eligibility Requirements of Section 109(a) of the Bankruptcy Code .................................................................... 21

        2.    The Debtors Meet Eligibility Requirements of Section 1517(a) of the Bankruptcy Code ............................................................... 23

            i.    The RJ Proceeding is a "Foreign Proceeding" ............................. 23

            ii.    The Foreign Representative is a Proper "Foreign Representative" .......................................................................... 25

i

iii.     The Petitions Were Properly Filed under Sections 1504 and 1509 and Meet the Requirements of Section 1515 and Bankruptcy Rule 1007(a)(4) .......................................................... 26

3.     The RJ Proceeding Should Be Recognized as a Foreign Main Proceeding.................................................................................. 28

     i.     A COMI Analysis under U.S. law focuses on where a Debtor's Business Interests are Principally Centered................... 28

     ii.     A COMI Analysis for Finance and Holding Companies Focuses on the Larger Corporate Group....................................... 31

     iii.     Substantial Evidence Across the Ambipar Group Structure Shows that each of the Debtors has its COMI in Brazil ............... 33

4.     In the Alternative, the Court Should Find that the RJ Proceeding Is a Foreign Nonmain Proceeding of each of the Non-Brazilian Debtors............................................................................................... 35

5.     If the Court Finds that the RJ Proceeding Is a Foreign Nonmain Proceeding for any Foreign Debtor, the Court Should Grant Discretionary Relief under Section 1521 .................................................... 38

B.     The Relief Requested Is Consistent with United States Public Policy and Policy Behind the Bankruptcy Code...................................................... 42

ii

4936-6919-6471

## TABLE OF AUTHORITIES

P<small>AGE</small>(S)

**Cases**

*ACLU v. Clapper*,
785 F.3d 787 (2d Cir. 2015).......................................................................................... 41

*Beveridge v. Vidunas (In re O'Reilly)*,
598 B.R. 784 (Bankr. W.D. Pa. 2019) ........................................................................... 36

*Calpine Corp. II*,
365 B.R. at 409............................................................................................................... 41

*Calpine Corp. v. Nev. Power Co. (In re Calpine Corp.)*,
354 B.R. 45 (Bankr. S.D.N.Y. 2006),
*aff'd*, 365 B.R. 401 (S.D.N.Y. 2007) ............................................................................. 40

*Cunard S.S. Co. v. Salen Reefer Servs. AB*,
773 F.2d 452 (2d Cir. 1985)........................................................................................... 42

*Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*,
737 F.3d 238 (2d Cir. 2013)........................................................................................... 21

*In re ABC Learning Ctrs. Ltd.*,
728 F.3d 301 (3d Cir. 2013)........................................................................................... 24

*In re AJW Offshore, Ltd.*,
488 B.R. 551 (Bankr. E.D.N.Y. 2013) ........................................................................... 39

*In re Ambipar Emergency Response*,
No. 25-90524 (ARP.......................................................................................................... 3

*In re Andrade Gutierrez Engenharia S.A.*,
No. 22-11425 (MG) (Bankr. S.D.N.Y. Dec. 2, 2022)..................................................... 26

*In re Atlas Shipping A/S*,
404 B.R. 726 (Bankr. S.D.N.Y. 2009) ........................................................................... 44

*In re Avanti Commc'ns Grp. PLC*,
582 B.R. 603 (Bankr. S.D.N.Y. 2018) ..................................................................... 22, 39

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund Ltd.*,
374 B.R. 122 (Bankr. S.D.N.Y. 2007) ................................................................. 26, 28, 31

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund Ltd.*,
389 B.R. 325 (S.D.N.Y. 2007)................................................................................... 26, 36

4936-6919-6471

*In re Berau Cap. Res. PTE Ltd.*,
540 B.R. 80 (Bankr. S.D.N.Y. 2015) ................................................................................... 22

*In re British Am. Ins. Co. Ltd.*,
425 B.R. 884 (Bankr. S.D. Fla. 2010) ................................................................. 29, 30, 33, 36

*In re Condor Ins. Ltd.*,
601 F.3d 319 (5th Cir. 2010) .............................................................................................. 19

*In re Creative Fin., Ltd. (In Liquidation)*,
543 B.R. 498 (Bankr. S.D.N.Y. 2016) ........................................................................... 30, 37

*In re Fairfield Sentry Ltd.*,
2011 U.S. Dist. LEXIS 105770 (S.D.N.Y. 2011) ................................................................. 29

*In re Geden Holdings, Ltd.*,
674 B.R. 732  (Bankr. S.D. Tex. 2025) ........................................................................ 26, 33, 36

*In re Glob. Ocean Carriers Ltd.*,
251 B.R. 31 (Bankr. D. Del. 2000) ..................................................................................... 22

*In re Globo Comunicações e Participações S.A.*,
317 B.R. 235 (Bankr. S.D.N.Y. 2004) ................................................................................ 22

*In re Ionosphere Clubs, Inc.*,
922 F.2d 984 (2d Cir. 1990) ............................................................................................... 43

*In re Irish Bank Resolution Corp. (In Special Liquidation)*,
2014 Bankr. LEXIS 1990 (Bankr. D. Del. Apr. 30, 2014) ................................................... 24

*In re Lines*,
81 B.R. 267 (Bankr. S.D.N.Y. 1988) .................................................................................. 41

*In re Metcalfe & Mansfield Alt. Invs.*,
421 B.R. 685 (Bankr. S.D.N.Y. 2010) ................................................................................ 39

*In re Metrofinanciera*, 2010 Bankr.
LEXIS 6540 (Bankr. S.D. Tex. Sep. 24, 2010) .................................................................... 26

*In re Millennium Glob. Emerging Credit Master Fund Ltd.*,
458 B.R. 63 (Bankr. S.D.N.Y. 2011) ........................................................................... 30, 36, 37

*In re Millennium Glob. Emerging Credit Master Fund Ltd.*,
471 B.R. 342 (Bankr. S.D.N.Y. 2012) ................................................................................ 19

*In re Mirant Corp.*,
316 B.R. 234 (Bankr. N.D. Tex. 2004) ............................................................................... 43

iv

*In re MMG LLC*,
   256 B.R. 544 (Bankr. S.D.N.Y. 2000) ................................................................. 41

*In re OAS S.A.*,
   533 B.R. 83 (Bankr. S.D.N.Y. 2015) ................................................... 24, 25, 31, 33

*In re Octaviar Admin. Pty Ltd.*,
   511 B.R. 361 (Bankr. S.D.N.Y. 2014) ................................................................. 21

*In re Odebrecht Engenharia e Construção S.A.*,
   No. 20-12741 (Bankr. S.D.N.Y. Dec. 30, 2020) .................................................. 25

*In re Odebrecht S.A.*,
   No. 19-12731 (Bankr. S.D.N.Y. Oct. 4, 2019) .................................................... 25

*In re Oi Brasil Holdings Coöperatief U.A.*,
   578 B.R. 169, 183 (Bankr. S.D.N.Y. 2017) ............................................. 26, 31, 32

*In re Oi S.A.*,
   587 B.R. 253 ........................................................................................................ 44

*In re Oi S.A.*,
   No. 23-10193 (Bankr. S.D.N.Y. Mar. 29, 2023) ........................................... 24, 41

*In re Ran*,
   607 F.3d 1017 (5th Cir. 2010) ...................................................................... 32, 36

*In re Rede Energia S.A.*,
   515 B.R. 69 (Bankr. S.D.N.Y. 2014) ................................................................... 44

*In re Rubin*,
   160 B.R. 269 (Bankr. S.D.N.Y. 1993) ................................................................. 41

*In re Samarco Mineração S.A. – Em Recuperação Judicial*,
   No. 21-10754 (LGB) (Bankr. S.D.N.Y. May 31, 2021) ...................................... 26

*In re Schimmelpenninck*,
   183 F.3d 347 (5th Cir. 1999) ............................................................................... 42

*In re Serviços de Petróleo Constellation S.A.*,
   600 B.R. 237 (Bankr. S.D.N.Y. 2019) ................................................. 24, 25, 36, 37

*In re Sino-Forest Corp.*,
   501 B.R. 655 (Bankr. S.D.N.Y. 2013) ................................................................. 43

*In re Siu-Fung Ceramics Holdings*,
   2026 Bankr. LEXIS 355 (Bankr. S.D. Tex. Feb. 10, 2026) ......................... passim

v

*In re SPhinX, Ltd.*,
   351 B.R. 103 (Bankr. S.D.N.Y. 2006) ................................................................................ 29

*In re Think3 Inc.*,
   2011 Bankr. LEXIS 5349 (Bankr. W.D. Tex. Sept. 12, 2011) .............................................. 28

*In re Tien Chiang*,
   437 B.R. 397 (Bankr. C.D. Cal. 2010) ................................................................................ 30

*In re U.S.J. - Açúcar e Álcool S.A.*,
   No. 22-10320 (DSJ) (Bankr. S.D.N.Y. Apr. 14, 2022) ........................................................ 26

*In re Unigel S.A.*,
   No. 24-11982 (Bankr. S.D.N.Y. Dec. 10, 2024) .................................................................. 24

*In re Yukos Oil Co.*,
   321 B.R. 396 (Bankr. S.D. Tex. 2005) ................................................................................ 21

*Lyondell Chem. Co. v. Centerpoint Energy Gas Servs. (In re Lyondell Chem. Co.)*,
   402 B.R. 571 (Bankr. S.D.N.Y. 2009) ................................................................................ 40

*Metcalfe & Mansfield*,
   421 B.R. at 697 ................................................................................................................... 43

*MF Global Holdings Ltd. v. Allied World Assur. Co. (In re MF Glob. Holdings Ltd.)*,
   562 B.R. 55 (Bankr. S.D.N.Y. 2017) .................................................................................. 40

*Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*,
   714 F.3d 127 (2d Cir. 2013) (citing 11 U.S.C. § 1501(a) ......................................... 19, 29, 30

*Nichols v. Alcatel USA, Inc.*,
   532 F.3d 364 (5th Cir. 2008) .............................................................................................. 40

*Phoenix Four, Inc. v. Strategic Res. Corp.*,
   446 F. Supp. 2d 205 (S.D.N.Y. 2006) ................................................................................ 28

*Shierson v. Vlieland-Boddy*,
   [2005] EWCA Civ. 974, [2005] W.L.R. 3966 (2005) .......................................................... 36

*Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*,
   825 F.2d 709 (2d Cir. 1987) ............................................................................................... 44

**Statutes**

11 U.S.C. § 101(23) .............................................................................................................. 23

11 U.S.C. § 101(24) .............................................................................................................. 25

11 U.S.C. § 1501 ................................................................................................................... 43

4936-6919-6471

11 U.S.C. § 1501(a) ........................................................................................................... 37

11 U.S.C. § 1502(2) ........................................................................................................... 36

11 U.S.C. § 1502(4) ........................................................................................................... 28

11 U.S.C. § 1517(a) ........................................................................................................... 23

11 U.S.C. § 1517(a)(3) ....................................................................................................... 26

11 U.S.C. § 1517(b)(2) ....................................................................................................... 35

11 U.S.C. § 1520(a)(3) ....................................................................................................... 35

11 U.S.C. § 1521 (a)(2) ...................................................................................................... 40

11 U.S.C. § 1521(a) ........................................................................................................... 39

11 U.S.C. § 1521(a)(1) ....................................................................................................... 40

11 U.S.C. § 1521(a)(1)-(2) ................................................................................................. 39

11 U.S.C. § 1521(a)(1)–(2), (e) ......................................................................................... 40

11 U.S.C. § 1521(e) ........................................................................................................... 40

11 U.S.C. § 1522(a) ........................................................................................................... 39

11 U.S.C. § 305(b) ............................................................................................................. 44

28 U.S.C. § 1410 .................................................................................................................. 2

28 U.S.C. § 157 .................................................................................................................... 2

28 U.S.C. § 157(b)(2)(P) ...................................................................................................... 2

28 U.S.C. §1334 ................................................................................................................... 2

4936-6919-6471

Thiago da Costa Silva (the "Foreign Representative"), in his capacity as the authorized foreign representative of the above-captioned debtors (collectively, the "Debtors"), which are the subject of jointly administered judicial reorganization (*recuperação judicial*) proceedings (the "RJ Proceeding") pursuant to Brazilian Federal Law No. 11.101 of February 9, 2005 (as amended, supplemented, or otherwise modified from time to time, including any successor statute thereto and all rules and regulations promulgated thereunder, "Brazilian Bankruptcy Law"), filed before the Third Business Court of Rio de Janeiro (the "Brazilian Court"), by and through the undersigned counsel, respectfully submits this motion (this "Motion") and states as follows:

## RELIEF REQUESTED

1.      The Foreign Representative respectfully requests entry of an order, substantially in the form attached hereto (the "Order"), pursuant to sections 105(a), 1504, 1515, 1517, 1520, 1521, and 1522 of title 11 of the United States Code (the "Bankruptcy Code"), (a) granting recognition of the RJ Proceeding as a "foreign main proceeding" (as defined in section 1502(4) of the Bankruptcy Code) of the Debtors, and all relief included therewith as provided in section 1520 of the Bankruptcy Code, or, in the alternative, as a "foreign nonmain proceeding" (as defined in section 1502(5) of the Bankruptcy Code) and granting appropriate relief; (b) recognizing the Foreign Representative as the "foreign representative" (as defined in section 101(24) of the Bankruptcy Code) with regard to the RJ Proceeding; and (c) granting such other relief as the Court deems just and proper.  The relief requested in this Motion is without prejudice to any additional relief the Foreign Representative may request.

2.      In support of this Motion, the Foreign Representative refers the Court to the statements contained in the:

> (a) *Declaration of Thiago da Costa Silva in Support of the Motion for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative and (III) Related Relief Under Chapter 15 of the Bankruptcy*

4936-6919-6471

*Code and Additional First Day Filings* (the "<u>Foreign Representative Declaration</u>"); and

(b) *Declaration of Gustavo Salgueiro pursuant to 28 U.S.C. § 1746 in Support of the Motion for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative and (III) Related Relief Under Chapter 15 of the Bankruptcy Code and Additional First Day Filings* (the "<u>Foreign Law Declaration</u>");

each of which was filed contemporaneously herewith and is incorporated herein in its entirety by reference.

### JURISDICTION

3. The United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P). The Debtors confirm their consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4. Venue is proper under 28 U.S.C. § 1410, as the lead Debtor is currently a debtor in a chapter 11 proceeding before the Court and venue in this district also is consistent with the interests of justice and the convenience of the parties with regard to the relief sought by the Foreign Representative.

5. The Foreign Representative has properly commenced these Chapter 15 Cases under sections 1504 and 1509 of the Bankruptcy Code by the filing of petitions for recognition of the RJ Proceeding under section 1515 of the Bankruptcy Code.

### PRELIMINARY STATEMENT

6. Founded in 1995, the Debtors and their non-debtor subsidiaries and affiliates (collectively, the "<u>Ambipar Group</u>") are a multinational, global leader in recycling, waste

4936-6919-6471

management, and emergency response businesses in Brazil and around the world. The Ambipar Group's two primary business segments—Environment and Response (each as defined below)—provide a full suite of services processing residues and recyclable materials throughout Latin America and operate emergency response command centers to respond to disasters such as wildfires and oil spills, respectively.

7.      On September 24, 2025, the Ambipar Group filed a petition for relief with the Brazilian Court seeking the Preliminary Injunction (as defined below) to obtain a thirty-day stay of creditor actions in Brazil and permit the Ambipar Group to negotiate a comprehensive restructuring with its financial stakeholders. Shortly after discussions began, however, it became clear that more time than the thirty-day Preliminary Injunction would be needed to reach a consensual resolution.

8.      To stabilize operations, the Ambipar Group determined that it was in its and its stakeholders' best interests to commence the RJ Proceeding on October 20, 2025 (the "RJ Petition Date") in the Brazilian Court. On the RJ Petition Date, Ambipar Emergency Response ("Ambipar Response") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Court, commencing the chapter 11 case captioned *In re Ambipar Emergency Response*, No. 25-90524 (ARP) (the "Chapter 11 Case").[2]

9.      Since the commencement of the RJ Proceeding and Chapter 11 Case, the Ambipar Group has continued negotiations with key creditor constituents with the goal of achieving a consensual financial restructuring.

---

[2]   A detailed description of the facts and circumstances giving rise to the Chapter 11 Case is set forth in the *Amended Declaration of Thiago da Costa Silva in Support of Chapter 11 Petition* filed at [Dkt. No. 15] in the Chapter 11 Case (the "Chapter 11 First Day Declaration"). All pleadings and other documents filed in the Chapter 11 Case are available free of charge at https://www.veritaglobal.net/ambipar.

10. After months of arm's-length negotiations, the Debtors and certain of their stakeholders reached an agreement on a comprehensive global restructuring of the Ambipar Group to be implemented in the RJ Proceeding, the terms of which are reflected in that certain Restructuring Support Agreement, dated as of July 9, 2026 (as may be amended, modified, or supplemented, and together with any exhibits thereto, the "RSA").  As of July 9, 2026 (the "RSA Effective Date"), holders of approximately 53.8% of the Green Notes (as defined below) (the "Consenting Holders") executed the RSA.  In the coming weeks, the Debtors anticipate obtaining additional support for the RSA from other members of the Ad Hoc Group and holders of Green Notes outside the Ad Hoc Group.  The RSA contemplates, among other things, pursuit of an amended restructuring plan in the RJ Proceeding on the terms outlined in the RSA.  The Ambipar Group believes that, with the support of the Consenting Holders and certain other creditors, it has obtained the requisite support to confirm a restructuring plan in the RJ Proceeding on terms consistent with the RSA (the "RJ Plan").

11. The Debtors commenced these Chapter 15 Cases to replace the pending Chapter 11 Case for Ambipar Response[3], give effect in the United States to the automatic stay imposed by the Brazilian Court in the RJ Proceeding, and, ultimately, give effect to the RJ Plan under U.S. law.

## **BACKGROUND**

**A.     General Background and History**

### *1.     Overview*

12. Founded in 1995, the Debtors, along with their affiliates, are a Brazilian corporate group that is a leader in recycling, waste management, and emergency response businesses in Brazil and around the world.  Foreign Rep. Decl. ¶ 7.  From its beginning as a waste management

---

[3]   Concurrently herewith the debtors have filed the Motion to Suspend (as defined below) in the Chapter 11 Case, requesting that the Court suspend the Chapter 11 Case and hold it in abeyance while the RJ Proceeding progresses.

4936-6919-6471

company, the Ambipar Group expanded into logistics and transportation for companies throughout Brazil. *Id.* In 2005, the Ambipar Group began operating waste management centers in Brazil. *Id.* Shortly thereafter, in 2008, the Ambipar Group launched its emergency response business. *Id.*

13. Debtor Ambipar Participações e Empreendimentos S.A. ("Ambipar Topco") was formed in 2010 as a holding company for the Ambipar Group's numerous operating subsidiaries. *Id.* ¶ 8. The Ambipar Group continued its expansion by making strategic acquisitions and, in 2019, undertook a comprehensive corporate restructuring and rebranding project pursuant to which the Ambipar Group divided its operating subsidiaries into two primary business segments: (a) "Environment," which handles, recycles, transports, and processes residues and recyclable materials throughout Latin America, and (b) "Response," which, among other things, operates emergency response command centers to respond to disasters such as wildfires and oil spills. *Id.*

14. In 2020, Ambipar Topco's capital stock was listed on the B3 stock exchange in São Paulo, Brazil, under the ticker symbol "AMBP3." *Id.* ¶ 9. In 2023, Debtor Ambipar Response was listed and began trading on the NYSE American under the ticker "AMBI." *Id.*

15. Today, the Ambipar Group operates through a network of more than 600 locations in 41 countries across the globe and employs more than 16,000 people. *Id.* ¶ 10.

16. The Environment segment specializes in providing environmental solutions and operates through its four main business segments: (a) circular economy; (b) decarbonization; (c) logistics; and (d) compliance, software, and consulting. *Id.* ¶ 11.

17. Response specializes in emergency response services and operates in four main business units: (i) emergency response services; (ii) industrial field services; (iii) consulting services focused on accident prevention and environmental licensing; and (iv) training services. *Id.* ¶ 12. Through its operating subsidiaries, Ambipar Response operates in over forty countries

5

4936-6919-6471

across six continents, providing standardized services across all regions.  *Id.*  Ambipar Response's

U.S. headquarters is in Houston, Texas, where, through its operating subsidiaries, it employs more

than 230 people.  *Id.*

18.     As further detailed below, the Ambipar Group is governed by the board of directors

of Ambipar Topco (the "Topco Board"), comprising six members, including the Ambipar Group's

founder and principal shareholder and one independent director.  *Id.*  ¶ 13.  The Topco Board is

primarily responsible for the Ambipar Group's strategic decisions.  *Id.*  The Topco Board's

meetings take place in Brazil, and each Topco Board member is a citizen or resident of Brazil.  *Id.*

Through the Topco Board, Ambipar Topco manages the operations of the Ambipar Group from

its headquarters in São Paulo, Brazil.  *Id.*

19.     Ambipar Response is governed by a separate board (the "Response Board"),

comprising eight members, including the Ambipar Group's founder and principal shareholder,

the Foreign Representative, and three independent directors.  *Id.* ¶ 14.  On October 29, 2025, the

Response Board (a) appointed David Mack as an independent director, (b) formed a special

committee (the "Response Special Committee") with a broad delegation of authority regarding

matters in which a conflict of interest exists or is reasonably likely to exist between Ambipar

Response and Ambipar Topco or its related parties ("Conflict Matters"), and (c) appointed Mr.

Mack to the Response Special Committee.[4]  *Id.*  As of the Petition Date, the Response Special

Committee remains in place with Mr. Mack as its sole member.  *Id.*

---

[4]     On October 30, 2025, Ambipar Response filed the *Notice of Appointment of Independent Director to the Board of Directors of the Debtor* [Dkt. No. 32] in the Chapter 11 Case (as defined below).

4936-6919-6471

### 2.      *The Ambipar Group's Corporate Structure and Offices*

20.      The chart below shows, in relevant part, a summary of the Ambipar Group's corporate structure as it pertains to the Debtors and certain of their related affiliates:



21.      As shown above, the Debtors and their key related affiliates are:

(a) **Ambipar Topco** – Ambipar Topco is a Brazilian-domiciled public company. It serves as the Ambipar Group's holding company, and the Topco Board makes strategic decisions for the Ambipar Group. *Id.* ¶ 16. Ambipar Topco has no employees or independent operations. Ambipar Topco is a guarantor of the Green Notes. *Id.*

(b) **Ambipar Response** – Ambipar Response is an exempted company incorporated with limited liability under the laws of the Cayman Islands and is the parent holding company for the Response business. *Id.* Its direct parent is Ambipar Topco. *Id.* Ambipar Response and its subsidiaries operate in more than forty countries. *Id.* Ambipar Response's registered office is located in the Cayman Islands and its headquarters is located in São Paulo, Brazil. *Id.* The Response Board is responsible for day-to-day governance of Ambipar Response and the Response Special Committee has a broad delegation of

7

4936-6919-6471

authority regarding Conflict Matters. *Id.* Ambipar Response is a limited guarantor of the Green Notes.[5] *Id.*

(c) **Emergência** – Debtor Emergência Participações S.A. ("Emergência," and, together with Ambipar Response, the "Response Debtors") is a corporation (*sociedade anônima)* incorporated under the laws of Brazil and a wholly-owned operating subsidiary of Ambipar Response. *Id.* Emergência's registered offices are in São Paulo, Brazil. *Id.* Emergência is a guarantor of the Itaú Loan (as defined below). *Id.*

(d) **Ambipar Environment** – Debtor Environmental ESG Participações S.A. ("Ambipar Environment," and, together with Ambipar Topco and Emergência, the "Brazilian Debtors") is a corporation (*sociedade anônima)* incorporated under the laws of Brazil and is the parent holding company for the Environment business. *Id.* Its direct parent is Ambipar Topco. *Id.* Ambipar Environment's registered offices are in São Paulo, Brazil. *Id.* Ambipar Environment is a guarantor of the Green Notes. *Id.*

(e) **Luxco** – Debtor Ambipar Lux S.à.r.l. ("Luxco") is a special purpose finance company and is the issuer of the Green Notes. *Id.* Luxco is incorporated in Luxembourg and has its registered office in Luxembourg. *Id.* Luxco is a wholly-owned subsidiary of Ambipar Topco, and Ambipar Topco directs all of its business from Brazil. *Id.* Luxco's board of directors comprises two directors in Brazil and, to comply with local law, two directors in Luxembourg. *Id.* Ultimate decision-making power, however, rests with the Board of Ambipar Topco in Brazil. *Id.* Luxco has no employees or operations and is wholly dependent on the financial performance of the other members of the Ambipar Group to repay its debts.

22.     As shown above, the Ambipar Group, which includes all of the Debtors, has its operational activities concentrated in Brazil and is subject to Brazilian laws and regulations. *Id.* ¶ 17.  Indeed, the Ambipar Group's primary operational activities are in Brazil, including its central operational management center, located in São Paulo, Brazil (the "São Paulo Office"). *Id.* The São Paulo Office maintains staff in charge of operational matters, including senior management, as well as the Ambipar Group's business strategy. *Id.* The Ambipar Group's main legal and human resources teams, as well as its information technology department, are primarily

---

[5]   Ambipar Response is a limited guarantor of up to $200 million of the 2031 Green Notes (as defined below) and up to $128.2 million of the 2033 Green Notes (as defined below).

8

4936-6919-6471

stationed at the São Paulo Office. *Id.* The Ambipar Group's business and finance teams are also concentrated in the São Paulo Office. *Id.* Although Ambipar Response and Luxco maintain registered offices outside of Brazil, neither Debtor has activities, assets, operations, or employees in the location of its registered office. *Id.*

23.     The books and records of each of the Debtors are located at the São Paulo Office. *Id.* ¶ 18. Luxco maintains a set of books and records in Luxembourg with a local corporate service provider to comply with applicable local regulatory requirements. *Id.* The Brazilian Debtors' books and records are maintained in *reais*. *Id.*

**B.      The Debtors' Assets and Capital Structure**

   ***1.      The Debtors' Assets and Operations***

24.     The Debtors' operations span approximately fourteen countries on six continents. *Id.* ¶ 19. Environment's operations are concentrated in Brazil and Chile, though its client base includes numerous companies throughout Latin America. *Id.* Response maintains a global presence, operating more than 400 operational bases worldwide with high concentrations in North America and Brazil. *Id.*

25.     The Debtors and their affiliates hold significant, varied assets used to support their broad range of functions and services. *Id.* ¶ 20. The Debtors' tangible assets primarily comprise property, plant, and equipment and include waste management facilities and vehicles, aircraft used in aerial emergency response to wildfires, vessels used in maritime oil spill response operations, and other related vehicles and equipment. *Id.* The Debtors also hold significant intangible assets, including numerous patents developed through Environment's research and development operations. *Id.* The Debtors also have significant goodwill accumulated as a result of extensive past and ongoing acquisition activity. *Id.*

9

(a)     Response

26.     The Response segment operates as a comprehensive, fully integrated platform for standardized emergency and industrial field services rendered at scale, organized within four business units:  (i) emergency response services; (ii) industrial field services; (iii) consulting services focused on accident prevention and environmental licensing; and (iv) training services. *Id.* ¶ 21.   The industrial field services unit encompasses tank cleaning, silo cleaning, asbestos removal, vessel and container cleaning, waste transportation and disposal, soil remediation, turnaround, and decommissioning.  *Id.*   The emergency response unit addresses accidents involving hazardous and non-hazardous chemical and non-chemical products and waste, as well as natural disasters including fires, floods, and hurricanes, and provides biological emergency management and response services, including services related to epidemics and pandemics.  *Id.* Emergency services are contracted either by subscription—under which customers pay a monthly fee for stand-by emergency assistance on a 24-hour basis—or on a spot basis at variable fees.  *Id.* The consulting services unit operates via a "Global Environmental Solutions" platform, providing accident prevention and environmental impact studies, environmental licensing assistance, construction management, health, safety and environment studies, and management of contaminated areas.  *Id.*  The training services unit offers professional training programs through proprietary training centers, supporting personnel from government agencies, firefighters, armies, and navies from countries including the United Kingdom, Portugal, Brazil, Chile, and Argentina. *Id.*

27.     The Response segment maintains operations in more than forty countries across six continents, with approximately 450 service centers distributed across South America, North America, Europe, Africa, and Antarctica.  *Id.* ¶ 22.  These service centers are supported by four regional, fully automated centralized operations centers located in Brazil (serving nationwide and

10

Antarctica), Chile (serving Latin America other than Brazil), the United Kingdom (serving Europe and Africa), and the United States (serving North America), each operating an outreach hotline and managing real-time asset tracking and deployment. *Id.* In 2022, Response acquired Witt O'Brien's LLC—a global leader in crisis and emergency management for corporate clients— adding consulting capabilities in the development of emergency and resilience programs for the U.S. government sector and a crisis management and command center in the United States. *Id.* In 2025, the Response segment accounted for approximately 43% of the Ambipar Group's global revenue. *Id.* As of the Petition Date, the Response segment employed approximately 7,000 personnel. *Id.*

(b)    <u>Environment</u>

28.    The Environment segment provides solutions integrating technology and sustainability, with a focus on achieving "zero landfill" by transforming residue and recyclable materials and reincorporating them into production processes. *Id.* ¶ 23. Environment's portfolio of services includes management and valorization of residue materials, co-processing, reusing, recycling, composting, decarbonization, and logistics solutions to more than 5,000 clients in over 170 on-site bases located throughout Latin America. *Id.* Ambipar Environment is the holding company for the Environment segment and maintains a prominent presence in Brazil, Chile, and other Latin American countries. *Id.* As of the Petition Date, Environment operated in four countries. *Id.*

29.    The Environment segment is organized into four business units: (a) circular economy; (b) decarbonization; (c) logistics; and (d) compliance, software, and consulting. *Id.* ¶ 24. The circular economy unit encompasses activities such as residue handling, residue movement, composting, effluent treatment, energy recovery, post-industrial recycling, and post-consumption recycling, utilizing embedded proprietary residue recovery technology and patents.

11

4936-6919-6471

*Id.* The decarbonization unit provides services through mitigation and the origination and commercialization of carbon credits within the voluntary market, including solutions for managing, reducing, and offsetting greenhouse gas emissions. *Id.* The logistics unit specializes in the transporting, storing, handling, and disposing of materials across Brazil and Latin America. *Id.* The compliance, software & consulting unit provides environmental, quality, health, and safety consulting and auditing services with the development of management software. *Id.*

30. In 2025, the Environment segment accounted for approximately 57% of the Ambipar Group's global revenue. *Id.* ¶ 25. As of the Petition Date, the Environment segment employed approximately 9,000 personnel. *Id.*

### 2. The Debtors' Capital Structure

31. Luxco is the issuer, and Ambipar Topco, Ambipar Response, and Ambipar Environment (collectively, the "Green Notes Guarantors") are guarantors, of two series of sustainability-linked bonds (the "Green Notes"):

(a) approximately $553 million in aggregate principal amount of 9.875% Green Notes due February 6, 2031 (the "2031 Green Notes") pursuant to the terms and conditions of a New York-law governed Indenture dated as of February 6, 2024 (as amended, supplemented, or otherwise modified, the "2031 Green Notes Indenture") among Luxco, the Green Notes Guarantors, and The Bank of New York Mellon, as indenture trustee, plus all accrued and unpaid interest and fees thereon; and

(b) approximately $493 million in aggregate principal amount of 10.875% Green Notes due February 5, 2033 (the "2033 Green Notes") pursuant to the terms and conditions of a New York-law governed Indenture dated as of February 5, 2025 (as amended, supplemented, or otherwise modified, the "2033 Green Notes Indenture," and, together with the 2031 Green Notes Indenture, the "Green Notes Indentures") among Luxco, the Green Notes Guarantors, and The Bank of New York Mellon, as indenture trustee, plus all accrued and unpaid interest and fees thereon. *Id.* ¶ 26.

32. Certain Debtors have also issued series of corporate debentures:

(a) Ambipar Topco is the issuer of approximately R$1.3 billion in aggregate principal amount of two series of debentures maturing in April 2029 (the

12

"Topco Debentures").  The Topco Debentures bear interest at the CDI rate (*Certificado de Depósito Interbancário*) ("CDI") plus margins of 275 and 245 basis points, respectively;

(b) Ambipar Environment is the issuer of one series of debentures maturing in September 2029 in an aggregate principal amount of approximately R$250 million (the "Environment Debentures").  The Environment Debentures bear interest at CDI plus a margin of 275 basis points; and

(c) Emergência is the issuer of approximately R$450 million of two series of debentures maturing in September 2028 and September 2029, respectively (the "Emergência Debentures," and, together with the Topco Debentures and the Environment Debentures, the "Debentures").  The Emergência Debentures bear interest at CDI plus margins of 265 basis points and 275 basis points, respectively.  *Id.* ¶ 27.

33.    Emergência is a guarantor of an approximately $90 million term loan facility (the "Itaú Loan") pursuant to that certain Loan Agreement, dated as of August 26, 2022 (as amended, restated, amended and restated, or otherwise modified from time to time, the "Itaú Credit Agreement"), by and among Ambipar Holding USA, Inc. (a non-debtor affiliate of the Debtors), as borrower, Emergência, as guarantor, and Itaú BBA International PLC, as lender.  *Id.* ¶ 28. Interest on the Itaú Loan accrues at an annual rate of 6.36%.  *Id.*  As of the Petition Date, the aggregate principal outstanding was approximately $90 million.  *Id.*  The Itaú Credit Agreement is governed by New York law.  *Id.*

34.    Certain of the Debtors guarantee the Currency Swaps (as defined below) and are party to other ordinary course working capital facilities and financing and equipment leasing arrangements.  *Id.* ¶ 29.  Certain of the Debtors also have significant intercompany obligations outstanding among themselves.  *Id.*

**C.    Events Leading to the Chapter 15 Filing**

35.    In the third quarter of 2025, certain of the Debtors' affiliates began facing increasing financial distress.  *Id.* ¶ 30.  Following the abrupt resignation of the Ambipar Group's chief financial officer, Deutsche Bank S.A. - Banco Alemão ("Deutsche Bank"), the counterparty

13

to certain of the Ambipar Group's currency swap contracts (the "Currency Swaps") and an affiliate of the lender on approximately $35 million of loans to the Ambipar Group, demanded that the Ambipar Group post additional collateral under the Currency Swaps. *Id.*

36.     Ambipar disputed and continues to dispute Deutsche Bank's calculation of the collateral requirements under the Currency Swaps.[6] *Id.* ¶ 31.  Nonetheless, the Ambipar Group provided approximately R$170 million ($31.4 million) in additional collateral contributions to Deutsche Bank. *Id.*  However, Deutsche Bank subsequently demanded that the Ambipar Group make an additional collateral contribution of R$60 million by September 25, 2025. *Id.*  Moreover, certain other financial institutions, including Banco Santander, notified Ambipar of alleged defaults under their respective financing agreements. *Id.*

37.     In light of these asserted defaults (and the cross-defaults that would ultimately result on the remainder of the Ambipar Group's funded debt), on September 24, 2025, the RJ Parties (as defined below) filed a petition with the Brazilian Court for a "preliminary injunction prior to the main action" (a *Tutela Cautelar Em Caráter Antecedente*) (the "Preliminary Injunction") that enjoined certain creditor actions (*e.g.*, assertion of defaults, enforcement of debt, and the exercise of remedies) for thirty days to permit restructuring negotiations. *Id.* ¶ 32.  On September 25, 2025, the Brazilian Court granted the Preliminary Injunction; however, it became clear that negotiations would require longer than the thirty days contemplated by the Preliminary Injunction. *Id.*

38.     Following the entry of the Preliminary Injunction, certain groups of the Debtors' stakeholders began organizing:

---

[6]     There are other disputes between the Ambipar Group and Deutsche Bank relating to the Currency Swaps, and the Ambipar Group reserves all rights against Deutsche Bank with respect to the Currency Swaps.

4936-6919-6471

(a) Certain holders of the Green Notes formed an ad hoc group (the "Ad Hoc Group") and retained Davis Polk & Wardwell LLP, as legal counsel, and Houlihan Lokey, as financial advisor.  The Debtors understand that the Ad Hoc Group holds a majority of the outstanding principal amount of the Green Notes; and

(b) Ambipar Response's main minority shareholders, Opportunity Agro Fundo de Investimento em Participações Multiestratégia Investimento no Exterior ("Opportunity") and HPX Capital Partners LLC, also organized.  On October 10, 2025, they sent a joint letter to the Board of Ambipar Topco alleging that Ambipar Topco "has exerted undue influence over the [Ambipar Response] for its own benefit and flouted corporate governance protocols."  *Id.* ¶ 33.

**D.      The RJ Proceeding and the Chapter 11 Case**

***1.      The RJ Proceeding***

39.      To allow additional time for the Ambipar Group to negotiate a comprehensive restructuring transaction with its stakeholders, on the RJ Petition Date, Ambipar Topco and certain of its subsidiaries (the "RJ Parties")[7] commenced the RJ Proceeding by filing a petition (the "RJ Petition") with the Brazilian Court.  *Id.* ¶ 34.  On October 30, 2025, the Brazilian Court entered an order (the "Processing Order"):  (a) granting the processing of the RJ Proceeding; (b) staying actions by creditors to collect obligations from the Ambipar Group and ordering publication of a public notice informing creditors of the RJ Proceeding; and (c) granting substantive consolidation (*consolidação substancial*) of certain entities within the Ambipar Group under Brazilian law for purposes of the RJ Proceeding.  *Id.*  The stay imposed pursuant to the Processing Order applies both in and outside Brazil.  Foreign Law Decl. ¶ 22.  A copy of the Processing Order and a certified English translation thereof are attached to the Foreign Representative Declaration as Exhibit A.

---

[7]      The full list of RJ Parties and copies of each of the filings in the RJ Proceeding are available free of charge from the Debtors' website:  https://ri.ambipar.com/en/judicial-reorganization-documents/. This website only contains information pertaining to the RJ Proceeding. For information and filings in the Chapter 15 Case, the Debtors will maintain a separate website that can be accessed free of charge at: www.veritaglobal.net/AmbiparChapter15. Information and filings in the Chapter 11 Case are located separately, free of charge, at: www.veritaglobal.net/Ambipar.

15

4936-6919-6471

40.     On the RJ Petition Date, the Debtors issued a press release to alert creditors of the filing of the RJ Proceeding (the "RJ Press Release"), and, on October 21, 2025, Ambipar Response filed a Form 6-K (the "Response 6-K," together with the RJ Press Release, the "RJ Publications") with the Securities and Exchange Commission (the "SEC") providing similar notice in the United States. *Id.* ¶ 35.

41.     The RJ Proceeding is the functional equivalent of a chapter 11 case under United States law.  Foreign Law Decl. ¶ 17.  The Ambipar Group remains in possession of its business and operations in Brazil and, pursuant to the Processing Order, is subject to a stay of creditor actions to collect on its outstanding obligations.  *Id.* ¶¶ 10, 22, 26.  On December 19, 2025, in accordance with a mandatory deadline under Brazilian law, the Ambipar Group filed an initial plan of reorganization in the RJ Proceeding.  Foreign Rep. Decl. ¶ 36.  This initial plan is materially different from the RJ Plan contemplated by the RSA, and the RJ Parties expect to file an amended plan of reorganization in the RJ Proceeding consistent with the RSA within the next several weeks. *Id.*  The RJ Proceeding is supervised by two court-appointed judicial administrators, who, among other duties, verify creditor claims and publish the official list of creditors entitled to vote on the plan of reorganization.  *Id.; Foreign Law Decl. ¶ 21.

42.     The RSA includes a steps plan (the "Steps Plan") providing certain milestones (the "Milestones") for the RJ Proceeding.  Pursuant to the Steps Plan:  (a) within 30 days of the RSA Effective Date, the Ambipar Group will finalize an agreed form of an amended plan of reorganization (the "RJ Plan"); (b) the RJ Plan will be filed in the RJ Proceeding 7 days prior to submission to be voted on by its creditors at a general creditors' meeting (the "GCM"); (c) within 50 days of the RSA Effective Date, the Judicial Administrator and the Brazilian Court will submit the RJ Plan for a vote at the GCM; (d) on the later of 90 days after the RSA Effective Date or 20

business days of the approval of the RJ Plan at the GCM, the Brazilian Court will enter an order confirming the approval of the RJ Plan (the "RJ Confirmation Order"); and (e) within 90 days of the entry of the RJ Confirmation Order, the Debtors and their affiliates will consummate the transactions contemplated under the RJ Plan.  Foreign Rep. Decl. ¶ 37.

### 2.      The Chapter 11 Case

43.      Concurrently with the RJ Proceeding, on October 20, 2025, Ambipar Response filed a voluntary petition commencing the Chapter 11 Case before the Court.  *Id.* ¶ 38.  The facts and circumstances giving rise to the Chapter 11 Case are described in detail in the Chapter 11 First Day Declaration.  Moreover, all pleadings and other documents filed in the Chapter 11 Case are available on the docket of the case and through the claims and noticing agent's website— https://www.veritaglobal.net/Ambipar.

44.      On November 17, 2025, Ambipar Response filed the *Debtor's Motion for Entry of an Order Authorizing the Debtor to (I) Enter Into the Funding Agreement, (II) Open Bank Accounts and (III) Granting Related Relief* [Dkt. No. 42] (the "Funding Agreement Motion"), seeking authorization to enter into that certain funding agreement (as amended, modified, or supplemented from time to time, the "Funding Agreement") with Ambipar Topco, pursuant to which Ambipar Topco would provide Ambipar Response with up to $3,000,000 to fund the Chapter 11 Case.  Foreign Rep. Decl. ¶ 39.  On December 19, 2025, the Court entered an order granting the Funding Agreement Motion [Dkt. No. 113] over an objection by Opportunity.  *Id.*  On May 12, 2026, Ambipar Response and Ambipar Topco amended the Funding Agreement to increase the available funding amount to $5,500,000 [Dkt. No. 187].  *Id.*

45.      On February 12, 2026, Ambipar Response filed the *Debtor's Motion for Entry of an Order Extending Exclusivity Period Pursuant to Section 1121(d) of the Bankruptcy Code* [Dkt. No. 141], seeking to extend the periods for Ambipar Response to file and solicit a chapter 11 plan

17

(the "Exclusivity Periods"). *Id.* ¶ 40. The Ad Hoc Group and Opportunity filed objections to the requested relief [Dkt. Nos. 153, 155]. *Id.* On May 8, 2026, following negotiations and agreement with the Ad Hoc Group, Ambipar Response filed the *Plan Scheduling Stipulation* [Dkt. No. 175] (the "Plan Stipulation"), which, among other things, resolved the Ad Hoc Group's objection to the motion and set forth an agreed schedule for Ambipar Response to file and solicit a proposed chapter 11 plan. *Id.* On May 18, 2026, following a contested hearing, the Court authorized Ambipar Response's entry into the Plan Stipulation and granted an extension of the Exclusivity Periods [Dkt. No. 201] over the objection of Opportunity. *Id.*

46.     Following approval of the Plan Stipulation, the Ambipar Group continued negotiations with the Ad Hoc Group on a comprehensive restructuring, culminating in entry into the RSA on July 2, 2026. *Id.* ¶ 41. As discussed above, as of the Petition Date, the RSA has the support of approximately 53.8% of the holders of Green Notes (with further support from holders of Green Notes expected in the coming weeks) and provides the framework for the terms and timeline of the RJ Plan, the RJ Proceeding, the Chapter 11 Case, and these Chapter 15 Cases. *Id.* Because the Debtors and the Ad Hoc Group have agreed on a case-resolution path pursuant to the RJ Plan, Ambipar Response, as chapter 11 debtor, has filed in the Chapter 11 Case a motion to suspend the Chapter 11 Case (the "Motion to Suspend") pursuant to section 305 of the Bankruptcy Code, contemporaneously with the commencement of these Chapter 15 Cases and requests that the Motion to Suspend be heard at the same hearing as this Motion. *Id.*

47.     On June 16, 2026, Luxco's governing body appointed Mr. Thiago da Costa Silva as the Foreign Representative in connection with the RJ Proceeding and authorized him to commence these Chapter 15 Cases pursuant to duly executed resolutions (the "Luxco Authorizing Resolution"). *Id.* ¶ 42. On June 23, 2026, Ambipar Topco, Ambipar Response, Ambipar

4936-6919-6471

Environment and Emergência's governing bodies executed resolutions authorizing the same (together with the Luxco Authorizing Resolution, the "Authorizing Resolutions"). *Id.* The Authorizing Resolutions are attached to the Foreign Representative Declaration as Exhibit C. The Foreign Representative expects to also commence an ancillary proceeding for Ambipar Response in the Cayman Islands, where Ambipar Response is domiciled. *Id.*

**BASIS FOR RELIEF REQUESTED**

48.     The Court should grant the Motion and recognize the RJ Proceeding as a foreign main proceeding for the Debtors.  Chapter 15 of the Bankruptcy Code is designed to, among other things, protect and maximize the value of a foreign debtor's assets and assist foreign representatives—such as the Foreign Representative—in performing their duties.  *See In re Condor Ins. Ltd.*, 601 F.3d 319, 322 (5th Cir. 2010) ("Chapter 15 provides for the 'recognition' of a 'foreign proceeding' and an ancillary proceeding to assist the foreign proceedings."); *In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 471 B.R. 342, 347 (Bankr. S.D.N.Y. 2012) ("[O]ne of the main purposes of chapter 15 is to assist a foreign representative in the administration of the foreign estate.").  Chapter 15's central goal is to "provide effective mechanisms for dealing with cases of cross-border insolvency while promoting international cooperation, legal certainty, fair and efficient administration of cross-border insolvencies, protection and maximization of debtors' assets, and the rescue of financially troubled businesses." *Morning Mist Holdings Ltd. v. Krys* (*In re Fairfield Sentry Ltd.*), 714 F.3d 127, 132 (2d Cir. 2013) (citing 11 U.S.C. § 1501(a)) (internal quotation marks omitted); *see In re Siu-Fung Ceramics Holdings*, 2026 Bankr. LEXIS 355, at *23–24 (Bankr. S.D. Tex. Feb. 10, 2026) (quoting 11 U.S.C. § 1501(a)).  Consistent with these principles, the Foreign Representative commenced these Chapter 15 Cases to obtain recognition of the RJ Proceeding, protect the Debtors' assets, and facilitate a comprehensive restructuring of the Ambipar Group's debt obligations.

19

49.     As set forth below, each procedural requirement for recognition under section 1515 of the Bankruptcy Code has been satisfied.  The Foreign Representative is the duly appointed "foreign representative" of the RJ Proceeding with respect to the Debtors, and the RJ Proceeding is a "foreign proceeding" for purposes of chapter 15 of the Bankruptcy Code.  Further, each Debtor's center of main interests ("COMI") is in Brazil.  Since the Debtors' founding, they have primarily operated in Brazil, and Brazil has been the "nerve center" of the Debtors' operations. Foreign Rep. Decl. ¶¶ 7–35.  Further, Brazil is the jurisdiction in which the Debtors' businesses and those of their affiliates can be comprehensively and efficiently restructured given that the Debtors form part of the Ambipar Group, which is based in Brazil and governed from Brazil, in accordance with the law of Brazil, where the majority of the Debtors' operations have historically centered and presently take place.  *Id.* ¶¶ 7–35.

50.     Although the Foreign Representative is confident that the RJ Proceeding constitutes a foreign main proceeding with respect to each Debtor within the definition set forth in section 1502(4) of the Bankruptcy Code, in an abundance of caution, the Foreign Representative also seeks, to the extent necessary, recognition of the RJ Proceeding as a foreign nonmain proceeding with respect to any Debtor for which the Court determines there is not a sufficient basis to recognize the RJ Proceeding as a foreign main proceeding.  In such event, for the reasons set forth below, the Debtors are eligible for nonmain recognition and related relief, including the imposition of a stay in accordance with sections 1521(a)(1) and (2) of the Bankruptcy Code, to the same extent such stay would be granted under section 1520(a) of the Bankruptcy Code.

51.     For the reasons set forth below and in the Foreign Representative Declaration and the Foreign Law Declaration, the relief sought herein is appropriate under chapter 15 of the Bankruptcy Code.

20

4936-6919-6471

**A.      The Debtors Are Eligible for Chapter 15 Relief**

52.     The Debtors must meet the general eligibility requirements under section 109(a) of the Bankruptcy Code as well as the more specific eligibility requirements under section 1517(a) of the Bankruptcy Code.  In addition, the petitions for recognition must meet the requirements of section 1515 of the Bankruptcy Code and Bankruptcy Rule 1007(a)(4).  The Debtors meet all such eligibility requirements.

> *1.      The Debtors Meet Eligibility Requirements of Section 109(a) of the Bankruptcy Code*

53.     Section 109(a) of the Bankruptcy Code provides that "[n]otwithstanding any other provision of this section, only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor under this title."  11 U.S.C. § 109(a).  Under section 109(a), a foreign debtor must reside or have a domicile, a place of business, or property in the United States to be eligible to file a chapter 15 petition.  *See Siu-Fung*, 2026 Bankr. LEXIS 355, at *33 (quoting *Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 247 (2d Cir. 2013)).

54.     Section 109(a) of the Bankruptcy Code does not require a specific amount or dollar value of property in the United States, nor does it indicate when or for how long such property must have a U.S. situs.  *See Siu-Fung*, 2026 Bankr. LEXIS 355, at *43 (observing that section 109(a) "says nothing about the amount of such property nor does it direct that there be any inquiry into the circumstances surrounding the debtor's acquisition of the property" (quoting *In re Octaviar Admin. Pty Ltd.*, 511 B.R. 361, 373 (Bankr. S.D.N.Y. 2014))); *In re Yukos Oil Co.*, 321 B.R. 396, 407 (Bankr. S.D. Tex. 2005) (observing that "nominal amounts of property located in the United States enable a foreign corporation to qualify as a debtor under Section 109(a)" because "there is 'virtually no formal barrier' to having federal courts adjudicate foreign debtors'

4936-6919-6471

bankruptcy proceedings" (internal quotations omitted) (quoting *In re Globo Comunicações e Participações S.A.*, 317 B.R. 235, 249 (Bankr. S.D.N.Y. 2004))).

55. Courts have accordingly held that bank accounts or attorney retainers with a situs in the United States satisfy the "property in the United States" eligibility requirement of section 109(a) of the Bankruptcy Code, even where such property was transferred to the United States for the purpose of satisfying the eligibility requirements. *See Siu-Fung*, 2026 Bankr. LEXIS 355, at *43 (holding that a prepetition retainer paid to counsel and held in a United States bank account satisfies section 109(a)); *Yukos*, 321 B.R. at 407 (holding that cash the debtor deposited in a U.S. bank account was sufficient property in the United States); *see also Octaviar*, 511 B.R. at 372–73 (rejecting argument that retainer deposited on the eve of filing was insufficient under section 109(a)); *In re Glob. Ocean Carriers Ltd.*, 251 B.R. 31, 39 (Bankr. D. Del. 2000) (holding that a retainer held by counsel to the debtors was sufficient property in the United States for all debtors).

56. Additionally, contracts (*e.g.*, indentures) governed by U.S. state law or contracts containing provisions submitting parties to the jurisdiction of U.S. state and federal courts give rise to property rights supporting debtor eligibility under section 109(a) of the Bankruptcy Code. *See, e.g.*, *In re Avanti Commc'ns Grp. PLC*, 582 B.R. 603, 610–11 (Bankr. S.D.N.Y. 2018) (holding that the debtor's indenture "is governed by New York law, which separately satisfies the 'property in the United States' requirement for eligibility to file a chapter 15 case under section 109(a) of the Bankruptcy Code"); *In re Berau Cap. Res. PTE Ltd.*, 540 B.R. 80, 84 (Bankr. S.D.N.Y. 2015) ("The Court concludes that the presence of the New York choice of law and forum selection clauses in the Berau indenture satisfies the section 109(a) 'property in the United States' eligibility requirement.").

22

57.    Here, the Debtors satisfy the eligibility requirement of section 109(a) because the Debtors have property in the United States, including in this jurisdiction.  Among other things, the Debtors have property in the United States, including (a) a bank account held by Ambipar Response at East West Bank in Pasadena, California, and (b) retainers held by local counsel in bank accounts on behalf of Ambipar Topco and Ambipar Response in Texas.  Foreign Rep. Decl. ¶ 43.  Additionally, the Green Notes Indentures, under which each of the Debtors (other than Emergência) is an obligor, and the Itaú Credit Agreement, under which Emergência is a guarantor, are each governed by New York law and contain provisions submitting the parties to the jurisdiction of New York state and federal courts.  *Id.*  Moreover, as described in the Foreign Representative Declaration, certain holders of the Green Notes have headquarters or significant operations in the borough of Manhattan. *Id.* ¶ 43.

### 2.    *The Debtors Meet Eligibility Requirements of Section 1517(a) of the Bankruptcy Code*

58.    Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing, "an order recognizing a foreign proceeding shall be entered if . . . (1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502; (2) the foreign representative applying for recognition is a person or body; and (3) the petition meets the requirements of section 1515."  11 U.S.C. § 1517(a).  Each of those requirements has been satisfied for the reasons set forth below.

### i.    *The RJ Proceeding is a "Foreign Proceeding"*

59.    First, to be a foreign main or foreign nonmain proceeding, the RJ Proceeding must be a "foreign proceeding" as defined in section 101(23) of the Bankruptcy Code.  Section 101(23) requires that a "foreign proceeding" be:  (a) a collective judicial or administrative proceeding relating to insolvency or adjustment of debt; (b) pending in a foreign country; (c) under

23

4936-6919-6471

the supervision of a foreign court; and (d) for the purpose of reorganizing or liquidating the assets and affairs of the debtor.  *See* 11 U.S.C. § 101(23); *see also In re ABC Learning Ctrs. Ltd.*, 728 F.3d 301, 308 (3d Cir. 2013); *In re Irish Bank Resolution Corp. (In Special Liquidation)*, 2014 Bankr. LEXIS 1990, at \*39–40 (Bankr. D. Del. Apr. 30, 2014).  The Bankruptcy Code defines "foreign court" as a "judicial or other authority competent to control or supervise a foreign proceeding."  11 U.S.C. § 1502(3).

60.     The RJ Proceeding meets each of these criteria.  The RJ Proceeding is a "collective" judicial insolvency proceeding involving the treatment of multiple creditors and claims together rather than attempting to resolve two-party disputes.  Foreign Law Decl. ¶ 6.  Furthermore, a judicial reorganization restructuring plan under the Brazilian Bankruptcy Law is intended to directly or indirectly benefit all creditors collectively and must be approved by a required majority of each class of claims.  *Id.* ¶ 31. The RJ Proceeding is pending in Brazil, a foreign country, where the assets and affairs of the Debtors and their affiliates are subject to the control and supervision by the Brazilian Court for the purpose of reorganization or liquidation.  *See id.* ¶ 26.  Moreover, courts have routinely held judicial reorganization proceedings under the Brazilian Bankruptcy Law (and other Brazilian restructuring laws) squarely meet the definition of a "foreign proceeding" as defined in the Bankruptcy Code and interpreted by bankruptcy courts.  *See, e.g.*, *In re Serviços de Petróleo Constellation S.A.*, 600 B.R. 237, 270 (Bankr. S.D.N.Y. 2019) ("[T]he Brazilian RJ process satisfies these standards."); *In re OAS S.A.*, 533 B.R. 83, 103 (Bankr. S.D.N.Y. 2015) ("Brazilian bankruptcy law meets our fundamental standards of fairness and accords with the course of civilized jurisprudence."); *see also In re Unigel S.A.*, No. 24-11982 (Bankr. S.D.N.Y. Dec. 10, 2024) [Dkt. No. 29] (granting recognition of Brazilian judicial reorganization as a foreign main proceeding); *In re Oi S.A.*, No. 23-10193 (Bankr. S.D.N.Y. Mar. 29, 2023) [Dkt. No. 30]

24

(same); *In re Odebrecht Engenharia e Construção S.A.*, No. 20-12741 (Bankr. S.D.N.Y. Dec. 30, 2020) [Dkt. No. 15] (same); *In re Odebrecht S.A.*, No. 19-12731 (Bankr. S.D.N.Y. Oct. 4, 2019) [Dkt. No. 27] (same); *In re Oi S.A.*, No. 16-11791 (Bankr. S.D.N.Y. July 22, 2016) [Dkt. No. 38] (same).  The Debtors respectfully submit that the Court should hold the same here.

### ii.      The Foreign Representative is a Proper "Foreign Representative"

61.      The Foreign Representative is the proper "foreign representative" with regard to the RJ Proceeding, thereby satisfying sections 101(24) and 1517(a)(2) of the Bankruptcy Code. Section 101(24) of the Bankruptcy Code provides that a foreign representative must be authorized "to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding."  11 U.S.C. § 101(24).  The Bankruptcy Code does not require that the foreign representative be appointed by the foreign court.  Instead, a debtor may appoint a foreign representative pursuant to corporate authorizations passed in accordance with applicable corporate laws.  *See Constellation*, 600 B.R. at 270 (finding a foreign representative appointed pursuant to resolution of the debtors' boards is a proper "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code and thus meets the requirements of section 1517(a)(2) of the Bankruptcy Code); *OAS*, 533 B.R. at 95 (holding that the "Bankruptcy Code does not require the judicial authorization or appointment of the foreign representative").

62.      Here, the Foreign Representative is an individual who has been duly appointed by the respective Debtors' boards of directors, shareholders, or authorized officers pursuant to the applicable corporate bylaws, as their foreign representative in accordance with section 101(24) of the Bankruptcy Code with authority to commence these Chapter 15 Cases.  Foreign Rep. Decl. ¶ 42.

63.      Moreover, courts in this district and others routinely recognize the appointment of foreign representatives in similar manners as acceptable for purposes of commencing chapter 15

25

4936-6919-6471

cases. *See*, *e.g.*, *In re Metrofinanciera*, 2010 Bankr. LEXIS 6540, at \*5 (Bankr. S.D. Tex. Sep. 24, 2010) (recognizing appointment of foreign representative pursuant to "resolutions from the Debtor's board of directors"); *In re Oi Brasil Holdings Coöperatief U.A.*, 578 B.R. 169, 183 (Bankr. S.D.N.Y. 2017) (recognizing appointment of foreign representative "pursuant to resolutions and powers of attorney signed by authorized representatives of each [foreign debtor]"); *see also In re Andrade Gutierrez Engenharia S.A.*, No. 22-11425 (MG) (Bankr. S.D.N.Y. Dec. 2, 2022) [Dkt. No. 40] (recognizing a person appointed by the chapter 15 debtors' board of directors as a duly appointed foreign representative within the meaning of section 101(24) of the Bankruptcy Code); *In re U.S.J. - Açúcar e Álcool S.A.*, No. 22-10320 (DSJ) (Bankr. S.D.N.Y. Apr. 14, 2022) [Dkt. No. 21] (same); *In re Samarco Mineração S.A. – Em Recuperação Judicial*, No. 21-10754 (LGB) (Bankr. S.D.N.Y. May 31, 2021) [Dkt. No 22] (same); *In re Odebrecht Engenharia e Construção S.A.*, No. 20-12741 (MEW) (Bankr. S.D.N.Y. Dec. 30, 2020) [Dkt. No. 15] (same).

### iii. The Petitions Were Properly Filed under Sections 1504 and 1509 and Meet the Requirements of Section 1515 and Bankruptcy Rule 1007(a)(4)

64. The third and final requirement for recognition of a foreign proceeding under section 1517(a) of the Bankruptcy Code is that the petition for recognition meets the procedural requirements of section 1515 of the Bankruptcy Code. *See* 11 U.S.C. § 1517(a)(3). Here, all of those procedural requirements are satisfied.

65. *First*, the Foreign Representative duly and properly commenced these Chapter 15 Cases in accordance with sections 1504 and 1509(a) of the Bankruptcy Code by filing the *Official Form 401 Petitions* (collectively, the "Petitions") with all the documents and information required by section 1515(b) and (c). *See In re Geden Holdings, Ltd.*, 674 B.R. 732, 736–37 (Bankr. S.D. Tex. 2025); *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund Ltd.*, 374 B.R. 122, 127 (Bankr. S.D.N.Y. 2007) [hereinafter *Bear Stearns I*], *aff'd*, 389 B.R. 325 (S.D.N.Y.

26

2008) [hereinafter *Bear Stearns II*] ("A case under chapter 15 is commenced by a foreign representative filing a petition for recognition of a foreign proceeding under section 1515 of the Bankruptcy Code.").[8]

66.     *Second*, in accordance with section 1515(b)(1)–(2) and (d) of the Bankruptcy Code, the Foreign Representative has submitted evidence, translated into English, of the existence of the RJ Proceeding and the appointment of the Foreign Representative as foreign representative thereof.  *See* Foreign Rep. Decl. Exs. A (Processing Order), C (Authorizing Resolutions).

67.     *Third*, in accordance with section 1515(c) of the Bankruptcy Code, the disclosures filed contemporaneously herewith (the "Bankruptcy Disclosures") contain a statement identifying the RJ Proceeding as the only foreign proceeding currently pending with respect to each of the Debtors.

68.     *Fourth*, with the filing of the Bankruptcy Disclosures contemporaneously herewith, the Foreign Representative has also satisfied the additional filing requirements set forth in Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"): (a) corporate ownership statements containing the information described in Bankruptcy Rule 7007.1, as required by Bankruptcy Rule 1007(a)(4)(A), and (b) lists containing the names and addresses of all persons or bodies authorized to administer the foreign proceedings of the Debtors and all parties to litigation pending in the United States in which the Debtors are a party at the time of the filing of the Petitions.

---

[8]     The Petitions are filed as ECF No. 1 at Case Nos. [•].

27

4936-6919-6471

**3.      *The RJ Proceeding Should Be Recognized as a Foreign Main Proceeding***

      *i.      A COMI Analysis under U.S. law focuses on where a Debtor's Business Interests are Principally Centered*

69.      With respect to each of the Debtors, the RJ Proceeding is a "foreign main proceeding" within the meaning of section 1502(4) of the Bankruptcy Code.  A "foreign main proceeding" is defined in the Bankruptcy Code as a "foreign proceeding pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1502(4).  Neither the Bankruptcy Code nor the UNCITRAL Model Law on Cross-Border Insolvency defines COMI.

70.      Courts view COMI as a concept rooted in substance over form—the debtor's "real seat."  *See Bear Stearns I*, 374 B.R. at 128, 130.  In short, a COMI analysis inquires as to the debtor's substantive "locus of operations"—the center of its operations, purpose, function, and activities, among others, *see Phoenix Four, Inc. v. Strategic Res. Corp.*, 446 F. Supp. 2d 205, 214–15 (S.D.N.Y. 2006) (internal citations and quotations omitted), as well as its nerve center, or the location where its main decisions are taken and its actions are directed.  *See In re Think3 Inc.*, 2011 Bankr. LEXIS 5349, at *17–18 (Bankr. W.D. Tex. Sept. 12, 2011) ("[C]ourts have often equated a corporate debtor's COMI with the debtor's principal place of business . . . [*i.e.*,] the place where a corporation's officers direct, control and coordinate the corporation's activities, otherwise known as its 'nerve center'" (internal citations omitted)).

71.      Courts have developed a list of factors a court may consider when determining a debtor's COMI.  These factors include:

> [T]he location of the debtor's headquarters; the location of those who actually manage the debtor (which conceivably could be the headquarters of a holding company); the location of the majority of the debtor's creditors or a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes . . . [the] "principal place of business" . . . [and] the expectations of third parties [as to the] debtor's COMI.

*In re Fairfield Sentry Ltd.*, 2011 U.S. Dist. LEXIS 105770, at \*10 (S.D.N.Y. 2011) (collecting cases); *Siu-Fung*, 2026 Bankr. LEXIS 355, at \*52–53 (applying the *Fairfield Sentry* factors); *see also In re British Am. Ins. Co. Ltd.*, 425 B.R. 884, 908–09 (Bankr. S.D. Fla. 2010); *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006). The Second Circuit added as additional possible factors "the location of headquarters, decision-makers, assets, creditors, and the law applicable to most disputes." *Fairfield Sentry*, 714 F.3d at 130; *see Siu-Fung*, 2026 Bankr. LEXIS 355, at \*52–53 (applying the *Fairfield Sentry* factors). These factors are "in the public domain" and thus "ascertainable and not easily subject to tactical removal." *Fairfield Sentry*, 714 F.3d at 136–38 (noting the "importance of factors that indicate regularity and ascertainability"); *see also British Am.*, 425 B.R. at 912 (finding that the "location of a debtor's COMI should be readily ascertainable by third parties").

72.     Although each of the *Fairfield Sentry* factors serves as a "helpful guide" in assessing a debtor's COMI, they are not exclusive, and no one factor is required or dispositive. *See Fairfield Sentry*, 714 F.3d at 137 (noting that "consideration of these specific factors is neither required nor dispositive" and warning against a mechanical application of the factors). The factors should be applied in light of pragmatic considerations for the "maximization of the debtor's value" and "the reasonable interests of parties in interest," as well as creditors' support for or acquiescence to a proposed COMI "because their money is ultimately at stake." *SPhinX*, 351 B.R. at 117. However, many courts interpret COMI to mean "principal place of business." *See Fairfield Sentry*, 2011 U.S. Dist. LEXIS 105770 at \*10 ("A debtor's COMI has also been equated with the concept of a 'principal place of business.'") (internal citations omitted). Indeed, courts and commentators have agreed that Congress could have invoked the same substantive inquiry with "principal place of business," but instead chose to leave unamended the "COMI" phrasing only to keep its statutory

29

text strictly uniform with the Model Law. *See In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 458 B.R. 63, 72-73 (Bankr. S.D.N.Y 2011) ("Chapter 15 was drafted to follow the Model Law as closely as possible, with the idea of encouraging other countries to do the same . . . .") . It is therefore unsurprising that courts have used the terms "center of main interests" and "principal place of business" interchangeably. *Id.* at 72.

73.      In determining which jurisdiction is best suited to house the main restructuring proceeding of a debtor, a court should consider which country is most involved in the debtor's commercial activities.  *In re Tien Chiang*, 437 B.R. 397, 403 (Bankr. C.D. Cal. 2010) ("The international insolvency legal regime is based on the assumption that every international entity has a home.  That country has the greatest interest in the status of the debtor and in the outcome of the insolvency case.  That country also has the greatest interest in the debtor because that country provides the legal regime that governs much of the debtor's commercial activities in most cases, including many matters unrelated to insolvency law.").  Indeed, many courts inquire first and foremost as to the place in which a debtor actually does business (*i.e.*, the location of its economic activities) when determining its COMI. *See Fairfield Sentry*, 714 F.3d at 130 ("The relevant principle . . . is that the COMI lies where the debtor conducts its regular business."); *In re Creative Fin., Ltd. (In Liquidation)*, 543 B.R. 498, 499, 517 (Bankr. S.D.N.Y. 2016); *British Am.*, 425 B.R. at 913–14 (rephrasing COMI as "the hub of the debtor's business" and finding that the debtor's COMI did not lie in its jurisdiction of incorporation because the debtor "simply did not do business" there).  This analysis must sensibly be tailored depending on the nature of the debtor and the type of business in which it engages. *British Am.*, 425 B.R. at 911 (activity relevant to a COMI determination "depend[s] on the nature of the debtor's business," *e.g.*,

30

where "[a debtor] operated as an insurance company, actuarial tasks, underwriting, and claims adjustment should be considered").

74.     Furthermore, U.S. case law requires that COMI analysis should be performed on an entity-by-entity basis.  *See Oi Brasil*, 578 B.R. at 206 (noting that the chapter 15 regime "require[s] COMI inquiries for each debtor entity rather than for collective corporate groups"). However, the Court should still take into account a debtor's integration into and function within an integrated corporate group, particularly where the debtor is a holding company and/or has no function independent from that of its group.  *See OAS*, 533 B.R. at 101–02 (COMI analysis for a foreign special-purpose company included consideration of its participation in a larger group).

### ii.     A COMI Analysis for Finance and Holding Companies Focuses on the Larger Corporate Group

75.     Consistent with a flexible and pragmatic approach to recognition, U.S. courts have tailored their COMI analyses varyingly across a wide range of facts and circumstances.  When determining the COMI of a company that is integrated with and exists only in the context of a larger corporate group, such as a holding or financing entity, courts focus on the considerations most indicative of that entity's "real seat."  *See Bear Stearns I*, 374 B.R. at 128; *see also OAS*, 533 B.R. at 101 (observing that the Austrian special purpose company "had no other business except to pay [the notes] off," and adding that "the Brazilian [b]ankruptcy [p]roceedings provide the only realistic chance to repay [those] [n]otes"); *Oi Brasil*, 578 B.R. at 226–27 (stating that the Dutch holding company's COMI lay in Brazil where the Dutch holding company had "no operations or business independent of the Oi [g]roup and [was] operated within the Oi [g]roup as part of a single, integrated economic unit . . . .").

76.     Finance and holding companies may be considered substantially integrated for purposes of a COMI analysis in the following situations:  (a) when they have no direct employees

31

or directly own no operational assets, as in the case of specialized finance companies; (b) where they belong to and exist only with reference to a larger corporate group with integrated operations, customers, corporate teams, marketing, research, development, strategy, human resource management, and administrative activities; and/or (c) where the group is financially integrated and interdependent as a result of intercompany loans and cross-company guarantees. *See Oi Brasil*, 578 B.R. at 226–27.

77.     Even where foreign companies maintain registered offices in, have directors living in, hold board meetings in, and are individually directed from their jurisdictions of organization, courts have still considered the entity's corporate reality as part of a larger, more complex organization. *See id.* at 177 (concluding that the Dutch special-purpose company in question had its COMI in Brazil even though it "file[d] financial statements with the Dutch Chamber of Commerce . . . pa[id] taxes in the Netherlands . . . file[d] tax returns with Dutch authorities in the Netherlands . . . ha[d] retained various professionals and advisors in the Netherlands . . ." and had an employee in the Netherlands).

78.     Courts evaluating the COMI of a finance or holding company focus special attention on the expectations of the debtor's creditors. Although creditor expectations can factor into a COMI analysis for all debtors—*see In re Ran*, 607 F.3d 1017, 1025 (5th Cir. 2010); *Siu-Fung*, 2026 Bankr. LEXIS 355, at *52—they are particularly significant for finance and holding companies. For example, in both *Oi Brasil* and *OAS*, the investors in the bonds issued by the special-purpose companies were advised in the offering memoranda and/or debt documentation that the entities had substantial connections in Brazil, and the creditors therefore assumed the risks of investing in a Brazilian enterprise. *Oi Brasil*, 578 B.R. at 228–29 (finding that the offering materials and indentures for the notes issued by the Dutch special-purpose company made clear

4936-6919-6471

that "any chance of repayment stems from the revenue-producing operations in Brazil"); *OAS*, 533 B.R. at 103 (noting that purchasers of the notes issued by the Austrian special-purpose company "expected to receive repayment from the cash generated by the operations of the [corporate group], and in the event of a default, might ultimately have to enforce their rights in a Brazilian bankruptcy proceeding").

### iii. *Substantial Evidence Across the Ambipar Group Structure Shows that each of the Debtors has its COMI in Brazil*

79.     Each of the Debtors in these Chapter 15 Cases has its COMI in Brazil. The Ambipar Group's principal economic activity has been and continues to be in Brazil, with Brazilian operations accounting for over 65% of the Ambipar Group's global revenue. Foreign Rep. Decl. ¶ 19. The Debtors' operations are principally managed by executives who are currently based, and have historically been based, in Brazil. Foreign Rep. Decl. ¶¶ 7–25. Likewise, the Debtors' operations are ultimately overseen by the Topco Board located in Brazil, and all strategic decisions with respect to the Debtors' businesses are made in Brazil. *Id.* ¶¶ 13–16. These activities demonstrate the existence of a shared, centralized COMI for all the Debtors as a part of their fully-integrated, shared activities. *See Geden*, 674 B.R. at 739 (citing *Fairfield Sentry* favorably and observing that "any relevant activities, including liquidation activities and administrative functions, may be considered in the court's COMI analysis"); *British Am.*, 425 B.R. at 911 (the location of business functions such as "financial, administrative, marketing, information technology, investment, and legal functions" speak to the location of COMI).

80.     On an entity-by-entity basis, the conclusion is the same:

(a)     **Ambipar Topco** – Ambipar Topco is a Brazilian-domiciled public company. Its registered office and headquarters are both located in Brazil. As discussed above, its officers and the Topco Board manage and oversee the Ambipar Group's operations from Brazil. Ambipar Topco is a registered taxpayer in Brazil and pays taxes in *reais*.

33

(b)   **Ambipar Environment** – Ambipar Environment is an entity formed under the laws of Brazil. Its registered office and headquarters are both located in Brazil. The Topco Board oversees its operations from Brazil. Ambipar Environment is a registered taxpayer in Brazil and pays taxes in *reais*.

(c)   **Emergência** – Emergência is an entity formed under the laws of Brazil. Its registered office and headquarters are both located in Brazil. Emergência is a registered taxpayer in Brazil and pays taxes in *reais*.

(d)   **Ambipar Response** – Ambipar Response is an exempted company incorporated with limited liability under the laws of the Cayman Islands, where it maintains its registered office. Ambipar Response has no operations, employees, activities, or assets in the Cayman Islands. The Response Board oversees Ambipar Response's and its subsidiaries' operations from Ambipar Response's headquarters in Brazil. The Response Board, like the Topco Board, comprises entirely Brazilian directors (other than the independent director recently appointed for purposes of conflict matters during the restructuring), and each of the officers of Ambipar Response is also a citizen of Brazil. Ambipar Response's books and records are recorded and reported in *reais* and are maintained at its headquarters in Brazil. Ambipar Response is a registered taxpayer in Brazil and pays taxes in *reais*. Ambipar Response is substantially integrated into the Ambipar Group through its operations and via intercompany loans with other entities within the Ambipar Group. Ambipar Response benefits from the coordinated group-wide activities that take place in the São Paulo Office, and it could not feasibly be restructured along with its affiliates in any centralized forum other than the RJ Proceeding.

(e)   **Luxco** – Luxco is a special purpose finance company formed under the laws of Luxembourg, where it maintains its registered office. Luxco has no operations, employees, activities, or assets (other than a parallel set of books and records maintained for purposes of compliance with local law) in Luxembourg. Luxco was formed to engage in those activities necessary for borrowing and guaranteeing debt in service of the Ambipar Group. To that end, Luxco's exclusive purpose is to borrow and repay the Green Notes, which are guaranteed by the other Debtors (other than Emergência). The final offering memoranda for the Green Notes (collectively, the "Offering Memoranda") stated that Luxco's ultimate parent, Ambipar Topco, and several of the other Green Notes Guarantors are Brazilian entities and that Ambipar Topco is listed on the Brazilian stock exchange. The Offering Memoranda listed Luxco's contact information as the Ambipar Group's headquarters in Brazil. The Offering Memoranda were clear that the Ambipar Group's business is dependent upon economic, political, and business conditions in Brazil. The Offering Memoranda further detailed how Brazil is one of the Ambipar Group's main markets and a significant portion of the Ambipar Group's revenue is derived from activities in Brazil.

34

4936-6919-6471

> Luxco is completely dependent on its Brazil-based parent company and affiliates to repay its debts. It is financially integrated with the Ambipar Group in Brazil through intercompany loans. All accounting and financial functions of Luxco are undertaken from the São Paulo Office. Luxco benefits from the coordinated group-wide activities that take place in the São Paulo Office, and it could not feasibly be restructured with its affiliates in any centralized forum other than the RJ Proceeding.

81.     For each of the foregoing reasons, each Debtor's COMI is Brazil. Accordingly, the RJ Proceeding pending in the Debtors' COMI is, and should be recognized as, the foreign main proceeding of each of the Debtors pursuant to section 1517(b)(1) of the Bankruptcy Code.

82.     All of the requirements of section 1517(a) have been satisfied, and the Debtors are therefore entitled to all of the relief provided by section 1520 of the Bankruptcy Code, including that the automatic stay applies to the Debtors and that the Foreign Representative be delegated the right to exercise the rights and powers of a trustee and be entitled to administer and realize all or part of the Debtors' assets within the territorial jurisdiction of the United States. *See* 11 U.S.C. § 1520(a)(3). Thus, the Court should enter the Order recognizing the RJ Proceeding as a foreign main proceeding.

### 4.     *In the Alternative, the Court Should Find that the RJ Proceeding Is a Foreign Nonmain Proceeding of each of the Non-Brazilian Debtors*

83.     For all the reasons set forth above, the RJ Proceeding should be recognized as a "foreign main proceeding" of each of the Debtors. Nevertheless, should this Court conclude that the RJ Proceeding is not the foreign main proceeding of any of the Debtors, in the alternative, the RJ Proceeding should be recognized as a "foreign nonmain proceeding" within the meaning of section 1502(5) for any such Debtors pursuant to section 1517(b)(2) of the Bankruptcy Code.

84.     Courts will recognize a foreign proceeding as a "foreign nonmain proceeding" if "the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending." 11 U.S.C. § 1517(b)(2). Chapter 15 provides no evidentiary

4936-6919-6471

presumption as to whether a debtor has an establishment in a particular jurisdiction. *See Ran*, 607 F.3d at 1026 (citing *Bear Stearns II*, 389 B.R. at 338); *Geden*, 674 B.R. at 746. Thus, whether an establishment exists in a particular location "is a factual question," and the Foreign Representative bears the burden of proof. *Geden*, 674 B.R. at 737, 746; *see British Am.*, 425 B.R. at 915. Importantly, section 1502(2) of the Bankruptcy Code defines an "establishment" as "any place of operations where the debtor carries out a nontransitory economic activity," and courts have required proof of "more than mere incorporation and record-keeping and more than just the maintenance of property." 11 U.S.C. § 1502(2); *Geden*, 674 B.R. at 739; *see Constellation*, 600 B.R. at 277 (internal citations omitted). At least one court—noting the "paucity of U.S. authority" on the subject—has favorably cited a "persuasive" English law holding that the presence of an asset and minimal management or organization can suffice to create an establishment. *See Millennium Glob*, 458 B.R. at 84–85 (citing *Shierson v. Vlieland-Boddy*, [2005] EWCA Civ. 974, [2005] W.L.R. 3966 (2005)).

85.   As with a determination of a debtor's COMI, whether the debtor has an "establishment" in a country is determined at the time of filing the chapter 15 petition. *See Beveridge v. Vidunas (In re O'Reilly)*, 598 B.R. 784, 803 (Bankr. W.D. Pa. 2019) (adopting *Fairfield Sentry* and *Ran* holdings that "the presumptive date from which [a c]ourt is to ascertain [a] debtor's center of main interests and/or establishment is the date the Chapter 15 petition was filed"). Several factors "contribute to identifying an establishment: the economic impact of the debtor's operations on the market, the maintenance of a 'minimum level of organization' for a period of time, and the objective appearance to creditors whether the debtor has a local presence." *Millennium Glob.*, 458 B.R. at 85. Showing the impact of the debtor's activities on the foreign jurisdiction involves a "showing of a local effect on the marketplace," evidenced by, among other

things, engagement of "local counsel and commitment of capital to local banks." *Creative Fin.*, 543 B.R. at 520; *Millennium Glob.*, 458 B.R. at 85.

86.     Notably, a basis for recognition of a foreign nonmain proceeding has been found where the debtor's affiliates "have substantial and ongoing business connections" in the jurisdiction, even though its COMI was determined to be in another country. *Constellation*, 600 B.R. at 281–82 (granting recognition of a Brazilian judicial reorganization proceeding as a foreign nonmain proceeding where the debtor's COMI was found to be in Luxembourg). In *Constellation*, the bankruptcy court found that "non-transitory ties to Brazil are sufficient to recognize the Brazilian Proceeding as a foreign nonmain proceeding with respect to [such non-Brazilian debtor]." *Id.*

87.     If the Court does not recognize the RJ Proceeding, the RJ Proceeding will face legal uncertainty and the RJ Plan itself may not succeed.  Indeed, recognition (and, ultimately, enforcement of the RJ Plan in the United States) is a condition precedent to consummation of the RJ Plan.  Foreign Rep. Decl. ¶¶ 41, 50.  Additionally, failure to enjoin collection efforts by various creditors may result in unnecessary enforcement costs or the piecemeal disposition of assets to the detriment of the Debtors and their various stakeholders.  The purpose of chapter 15 is to prevent such harms.  *See* 11 U.S.C. § 1501(a) (noting that, among other objectives described herein, chapter 15 facilitates "the rescue of financially troubled business" and provides for the "fair and efficient administration of cross-border insolvencies").  Avoiding such potential adverse outcomes through the formal recognition of the RJ Proceeding in the United States effectuates the principal objectives Congress articulated when it enacted chapter 15 of the Bankruptcy Code and otherwise comports with U.S. public policy.

4936-6919-6471

88.     Here, the Ambipar Group (of which the Debtors are a part) is an integrated corporate group managed from Brazil and doing business principally in Brazil.  Foreign Rep. Decl. ¶¶ 19–25.  The Debtors are managed from Brazil, and each of the Debtors is ultimately controlled from Brazil.  *Id.* ¶¶ 13–16.  Moreover, Luxco is directly owned by Ambipar Topco, a Brazilian entity.  *Id.* ¶ 16.

89.     As such, even if the Court, for any reason, determines that any Debtor lacks COMI in Brazil, the facts set forth above support a finding that each Debtor maintains an establishment in Brazil.

### 5.     If the Court Finds that the RJ Proceeding Is a Foreign Nonmain Proceeding for any Foreign Debtor, the Court Should Grant Discretionary Relief under Section 1521

90.     To the extent that the RJ Proceeding is recognized only as a foreign nonmain proceeding, the Foreign Representative requests that this Court (a) stay the commencement or continuation of proceedings concerning the Debtors' assets, rights, obligations, or liabilities within the territorial jurisdiction of the United States (except to the extent that a stay may not be ordered under subsections (d) and (f) of section 1521 of the Bankruptcy Code), (b) stay all entities from executing against, interfering with, or otherwise disposing of the Debtors' assets within the territorial jurisdiction of the United States (except to the extent that a stay may not be ordered under subsections (d) and (f) of section 1521 of the Bankruptcy Code), and (c) entrust the Foreign Representative with the administration of all of the Debtors' assets within the territorial jurisdiction of the United States.

91.     The Court may exercise its discretionary powers under section 1521 of the Bankruptcy Code to grant "any appropriate relief" to a foreign representative "where necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the interests of the creditors," provided that the "interests of the creditors and other interested entities, including

4936-6919-6471

the debtor, are sufficiently protected."  11 U.S.C. §§ 1521(a), 1522(a); *see also Avanti Commc'ns Grp.*, 582 B.R. at 612 ("The discretion that is granted is exceedingly broad, since a court may grant any appropriate relief that would further the purposes of chapter 15 and protect the assets and interests of creditors.").  One form of relief enumerated in the statute is the granting of a stay of litigation and collection efforts.  11 U.S.C. § 1521(a)(1)–(2).

92. While the Bankruptcy Code does not explicitly define "sufficiently protected," the legislative history indicates that additional relief should be granted unless "it is shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors."  H.R. Rep. No. 109-31, pt. 1, at 116 (2005).  As a result, courts have focused on the procedural fairness of the foreign proceeding to determine whether creditors are sufficiently protected.  *See In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010) (examining whether the procedures utilized in the foreign proceeding accorded the American notions of fundamental fairness).

93. A determination of sufficient protection also "requires a balancing of the respective parties' interests."  *In re AJW Offshore, Ltd.*, 488 B.R. 551, 559 (Bankr. E.D.N.Y. 2013) (citing *SNP Boat Serv. S.A. v. Hotel Le St. James*, 483 B.R. 776, 784 (S.D. Fla. 2012)).

94. Here, creditors are sufficiently protected.  The stay granted by the Brazilian Court supports the collective RJ Proceeding.  Each creditor has had, and continues to have, the opportunity to appear and be heard in the RJ Proceeding.  Foreign Law Decl. ¶¶ 46-48.  The RJ Proceeding is also procedurally fair.  The Debtors publicized their filing by releasing the RJ Publications.  Foreign Rep. Decl. ¶ 35.

95. The balance of interests also weighs in favor of granting additional relief under section 1521.  Approval of the stay will facilitate the efficient and orderly restructuring of

4936-6919-6471

the Debtors in a centralized, organized proceeding—the RJ Proceeding—thus protecting creditors' interests and maximizing asset value by preventing a race to the courthouse. Foreign Law Decl. ¶¶ 6, 22, 26.

96. Finally, section 1521(e) of the Bankruptcy Code provides that the standards, procedures, and limitations applicable to an injunction apply to relief sought under sections 1521(a)(1), (2), (3), and (6). 11 U.S.C. § 1521(e). Here, the Foreign Representative is requesting relief under sections 1521(a)(1) and (a)(2) by granting stays of any actions against the Debtors or their assets by suit or execution and therefore must show that the standards for injunctive relief are satisfied. *See* 11 U.S.C. § 1521(a)(1)–(2), (e).

97. To obtain an injunction, a movant must demonstrate that (a) there is a likelihood of successful reorganization; (b) there is an imminent irreparable harm to the debtor in the absence of an injunction; (c) the balance of harms tips in favor of the moving party; and (d) the public interest weighs in favor of an injunction. *See Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008); *Lyondell Chem. Co. v. Centerpoint Energy Gas Servs. (In re Lyondell Chem. Co.)*, 402 B.R. 571, 588–89 (Bankr. S.D.N.Y. 2009); *see also Calpine Corp. v. Nev. Power Co. (In re Calpine Corp.)*, 354 B.R. 45, 48–50 (Bankr. S.D.N.Y. 2006), *aff'd sub nom. Nevada Power Co. v. Calpine Corp. (In re Calpine Corp.)*, 365 B.R. 401 (S.D.N.Y. 2007). Courts require movants to show all four of these factors or, in the alternative, to "show irreparable harm and either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *MF Global Holdings Ltd. v. Allied World Assur. Co. (In re MF Glob. Holdings Ltd.)*, 562 B.R. 55, 64 (Bankr. S.D.N.Y. 2017) (citing *ACLU*

40

*v. Clapper*, 785 F.3d 787, 825 (2d Cir. 2015)).  In evaluating these factors, courts take a "flexible approach and no one factor is determinative."  *Calpine Corp.*, 365 B.R. at 409.

98.     In the context of a chapter 15 case, demonstrating a likelihood of success on the merits requires the petitioner to show that he or she is likely to obtain recognition of the foreign proceeding.  *See Oi S.A.*, No. 16-11791 (SHL) (Bankr. S.D.N.Y. June 22, 2016) [Dkt No. 22 at 3] ("Based on the pleadings filed to date, the [c]ourt concludes that the [p]etitioner has demonstrated a likelihood that [p]etitioner will be able to . . . obtain recognition of the [foreign proceeding]."). This Court has been briefed on the merits of this Motion and the discretionary relief sought hereby and will decide the issue of granting discretionary relief together with the issue of recognition. The Court also may not grant discretionary relief if it denies recognition.  As such, if the Court reaches the issue of discretionary relief, recognition will have been granted and the Debtors will have succeeded on the merits.

99.     Irreparable harm exists where the orderly and equitable determination of claims and distribution of a debtor's assets could be disrupted absent injunctive relief.  *E.g.*, *In re MMG LLC*, 256 B.R. 544, 555 (Bankr. S.D.N.Y. 2000) ("The guiding principle of bankruptcy law is equality of distribution. . . .  As a rule, therefore, irreparable harm exists whenever local creditors of the foreign debtor seek to collect their claims or obtain preferred positions to the detriment of the other creditors."); *In re Rubin*, 160 B.R. 269, 283 (Bankr. S.D.N.Y. 1993) ("the premature piecing out of property involved in a foreign liquidation proceeding constitutes irreparable injury" (quoting *In re Lines*, 81 B.R. 267, 270 (Bankr. S.D.N.Y. 1988))).

100.     Without an injunction barring creditors from seeking judgments in the United States in contravention of the Processing Order, certain creditors may attempt to assert claims in United States courts to get ahead of other creditors in Brazil.  Defending against such actions would

41

deplete the Debtors' assets and threaten their ability to operate as going concerns.  Any judgments awarded in any such litigation would lead to piecemeal distribution of the Debtors' assets, disadvantage other creditors, and subvert the Debtors' ability to effectuate a centralized restructuring in one forum.  For these reasons, allowing creditors to litigate claims in the United States would threaten the Debtors' chances of implementing a successful restructuring and cause irreparable harm to the Debtors.  The requested relief, conversely, would protect the interests of all of the Debtors' creditors by centralizing all disputes in the Brazilian Court, maximizing the Debtors' going-concern value, and ensuring that prepetition claims are determined and paid on a consistent, nondiscriminatory basis in accordance with any eventual plan in Brazil.

101.    The balance of the harms also weighs in favor of discretionary relief.  The stay will merely preserve the *status quo*.  Foreign Rep. Decl. ¶ 51.  The stay does not bar parties from participating in the RJ Proceeding and, as set forth above, the stay and the RJ Proceeding are procedurally fair.  Foreign Law Decl. ¶¶ 46-48.

102.    Granting the stay is consistent with the public interest because public policy favors an equitable distribution of property amongst stakeholders in foreign insolvency proceedings.  *See In re Schimmelpenninck*, 183 F.3d 347, 365 n.54 (5th Cir. 1999) (citing *Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 459 (2d Cir. 1985) (noting in a case under former section 304 of the Bankruptcy Code the strong "public interest in the fair and efficient distribution of assets in a bankruptcy")).  Therefore, discretionary relief is proper under section 1521 and should be granted.

**B.      The Relief Requested Is Consistent with United States Public Policy and Policy Behind the Bankruptcy Code**

103.    The purpose of chapter 15 is set forth in section 1501 of the Bankruptcy Code and includes:

> (i)      cooperation between (a) courts of the United States, the United States Trustee, trustees, examiners, debtors, and debtors

> in possession; and (b) the courts and other competent authorities of foreign countries involved in cross-border insolvency cases;
>
> (ii) greater legal certainty for trade and investment; (iii) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor; (iv) protection and maximization of the value of the debtor's assets; and (v) facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

11 U.S.C. § 1501. Recognition of the RJ Proceeding as a foreign main proceeding comports with all of these objectives.

104. Although section 1506 of the Bankruptcy Code provides that nothing in chapter 15 shall prevent the Court from refusing to take an action otherwise required therein if such action would be manifestly contrary to the public policy of the United States, the public policy exception is narrowly construed. *See, e.g.*, *In re Sino-Forest Corp.*, 501 B.R. 655, 665 (Bankr. S.D.N.Y. 2013); *Metcalfe & Mansfield*, 421 B.R. at 697. Moreover, the public policy exception must be viewed in light of one of the fundamental goals of the Bankruptcy Code—the centralization of disputes involving the debtor. *See, e.g.*, *In re Mirant Corp.*, 316 B.R. 234, 242 (Bankr. N.D. Tex. 2004) (recognizing the Bankruptcy Code's "goal . . . to provide a centralized forum for resolution of claims against Debtors"); *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 989 (2d Cir. 1990) ("The Bankruptcy Code provides for centralized jurisdiction and administration of the debtor, its estate and its reorganization in the Bankruptcy Court . . . ." (internal citations and quotation marks omitted)). Indeed, as some courts have noted:

> American courts have long recognized the need to extend comity to foreign bankruptcy proceedings because the equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail.

43

4936-6919-6471

*In re Atlas Shipping A/S*, 404 B.R. 726, 733 (Bankr. S.D.N.Y. 2009) (internal quotation marks omitted) (citing *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 733 (2d Cir. 1987)).

105.   Recognition of the RJ Proceeding will enable the Debtors to focus on implementing a centralized restructuring transaction and promote fair and efficient cross-border reorganization procedures that protect all stakeholders and interested parties.  Even more, "Brazilian bankruptcy law meets our fundamental standards of fairness and accords with the course of civilized jurisprudence."  *In re Rede Energia S.A.*, 515 B.R. 69, 98 (Bankr. S.D.N.Y. 2014); *see also In re Oi S.A.*, 587 B.R. 253, 269 (Bankr. S.D.N.Y. 2018) ("[T]his and other courts have found that Brazilian bankruptcy law is consistent with U.S. policy and provides creditors meaningful protections similar to those provided under U.S. law.").  Furthermore, recognition of the RJ Proceeding and suspension and ultimate dismissal of the Chapter 11 Case for Ambipar Response is expressly contemplated and sanctioned by the Bankruptcy Code when consistent with comity and the other purposes of chapter 15.  *See* 11 U.S.C. § 305(b); *see also* Motion to Suspend ¶¶ 10–12.

## NOTICE

106.   In accordance with Bankruptcy Rule 2002(q), the Foreign Representative will provide notice of this Motion to (a) the Debtors; (b) the Office of the United States Trustee for the Southern District of Texas; (c) all parties appearing on the master creditor matrix maintained by the noticing agent for Ambipar Response in the Chapter 11 Case; and (d) the parties proposed to receive notice, as set forth in Exhibit 2 to the order attached as Exhibit A to the *Emergency Motion Pursuant to Fed. R. Bankr. P. 2002 and 9007 Requesting Entry of Order Scheduling Recognition Hearing and Specifying Form and Manner of Service of Notice*, filed contemporaneously herewith.

44

45

## NO PRIOR REQUEST

107.     No previous request for the relief sought herein has been made by the Foreign

Representative to this or any other court.

[*Remainder of page intentionally left blank*]

4936-6919-6471

WHEREFORE the Foreign Representative respectfully requests entry of the Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

/s/  Jason S. Brookner

**GRAY REED**
Jason S. Brookner (24033684)
Lydia R. Webb (24083758)
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone:      (713) 986-7000
Facsimile:      (713) 986-7100
E-mail:          jbrookner@grayreed.com
                 lwebb@grayreed.com

**SIMPSON THACHER & BARTLETT LLP**
David R. Zylberberg (*pro hac vice* pending)
Nicholas E. Baker (*pro hac vice* pending)
Moshe A. Fink (*pro hac vice* pending)
Rachael L. Foust (*pro hac vice* pending)
Zachary J. Weiner (*pro hac vice* pending)
425 Lexington Avenue
New York, New York 10017
Telephone:  212-455-3702
Facsimile:  212-455-2502
E-mail:      david.zylberberg@stblaw.com
             nbaker@stblaw.com
             moshe.fink@stblaw.com
             rachael.foust@stblaw.com
             zachary.weiner@stblaw.com

*Co-Counsel to the Foreign Representative*            *Co-Counsel to the Foreign Representative*

4936-6919-6471

**<u>Certificate of Service</u>**

I certify that on July 9, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Jason S. Brookner*
Jason S. Brookner

4936-6919-6471